UNITED STATES DISTRICT COURT FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SPIRIT LOCKER, INC.,                                    :
                                                        :
                            Plaintiff,                  :
                                                        :    MEMORANDUM
                - against -                             :    AND ORDER
                                                        :
EVO DIRECT, LLC, d/b/a EVO MERCHANT                     :
SERVICES, INC.                                          :    09-CV-1582 (JG)
                                                        :
                            Defendant.                  :
------------------------------------------------------------X

A P P E A R A N C E S:

       CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN, P.C.
           5 Becker Farm Road
           Roseland, NJ 07068
       By:   Lindsey H. Taylor

           --and--

       SEEGER WEISS LLP
           One William Street
           New York, NY 10004
       By:   Christopher Seeger
           Stephen A. Weiss

           --and--

       FREED & WEISS LLP
           111 West Washington Street, Suite 1331
           Chicago, IL 60602
       By:   Eric D. Freed
           Jeffrey A. Leon
           Eric C. Brunick
           Attorneys for Plaintiff

       PEPPER HAMILTON LLP
           620 Eighth Avenue, 37th Floor
           New York, NY 10018
       By:   Kenneth J. King
           Angelo Stio
           Michael J. Canavan
           Attorneys for Defendant

JOHN GLEESON, United States District Judge:

Spirit Locker, Inc. brings this diversity action against EVO Direct, LLC ("EVO"), alleging that an early termination fee in the contract between the parties is an unlawful penalty. The complaint asserts causes of action for deceptive practices and for unjust enrichment. EVO now moves to dismiss each of these claims. For the reasons explained below, I grant EVO's motion to dismiss the deceptive practices count, but deny the motion to dismiss the unjust enrichment claim.

## BACKGROUND

A.  *Factual Background*

EVO, a Delaware LLC with its principal place of business in the state of New York, provides electronic payment processing services. Retailers pay EVO to process their customers' credit card payments. On March 22, 2008, Spirit Locker, an Alabama liquor store, engaged EVO's services. The parties entered into a contract in which EVO agreed to process all of Spirit Locker's Visa, MasterCard and American Express credit and debit card payments for three years. *See* Compl. Ex. A. The parties' contract was embodied in a Merchant Services Agreement. In return for credit card processing, Spirit Locker agreed to pay a monthly sum that differed every month, depending on the volume and type of transactions processed by EVO for Spirit Locker. Though the Merchant Services Agreement is a standard form provided by EVO, the major price terms, including EVO's percentage cut, were initially left blank and written into the contract at the time of the agreement.[1] *See id.*

---

[1]  Moreover, though a few of the price terms were initially set by the pre-printed form, some of those fixed fees were crossed out by hand and replaced with lower amounts in Spirit Locker's contract. *See* Compl. Ex. A.

EVO's early termination fee ("ETF") – the subject of this action – is first mentioned on the second page of the Agreement: "I/We understand and agree to the following ... (9) An early closure fee of $395.00 will be paid to EVO if the Merchant Processing Agreement is not terminated in accordance with the Terms and Conditions." Compl. Ex. A. In addition, the parties agreed to EVO's standard-form Terms and Conditions, which list the contract's ancillary provisions in three dense pages of fine print. There, deep in a paragraph headed "Action Upon Termination," the Agreement again mentions the ETF, stating as follows:

> Early Termination. If you terminate this agreement before the end of the Initial Term, or before the end of any successive Renewal Term, in violation of the procedure set forth in Section 13(B) above,[2] ... you will immediately pay ... as liquidated damages, a closure fee of $395.00. You agree that this fee is not a penalty, but rather is reasonable in light of the financial harm caused by the early termination of this agreement.

*Id.* Ex. A, § 13(C).

The Merchant Processing Agreement selects New York law to govern the contract, and requires Spirit Locker to bring claims arising out of or relating to the agreement in a court of competent jurisdiction in Nassau County, New York. Compl. Ex. A, § 16(B). The Agreement also provides that if one of its provisions is found to be illegal, the invalidity of that term does not affect the rest of the Agreement. *Id.* § 16(J).

Just three months in to the three-year term, Spirit Locker cancelled the agreement, citing "shoddy service and improper charges." Compl. ¶ 24. As a result, EVO imposed the $395 ETF, which was automatically debited from Spirit Locker's account on file with EVO. *Id.* Ex. B.

---

[2] Under section 13(B), the merchant may terminate the Agreement at the end of the term by giving notice of an intention not to renew at least 90 calendar days before the end of the term.

B.    *Procedural History*

On April 16, 2009, Spirit Locker filed a complaint against EVO in this Court, alleging that the ETF is an unlawful penalty and that EVO is guilty of deceptive practices.[3]   The complaint alleges that EVO charges its customers the $395 ETF whether they cancel service fifteen days into the contract period or one day before the contract is scheduled to expire. Compl. ¶ 16.  Moreover, according to Spirit Locker, EVO imposes its flat-rate $395 charge regardless of the reason for cancellation, even if the cancellation is the result of non-existent, poor, or otherwise inadequate service.  *Id.* ¶ 17.

Spirit Locker alleges that the ETF is not a reasonable measure of EVO's anticipated or actual loss from an early termination, and that the ETF is not intended to compensate EVO for damage, but rather is designed to serve as a disincentive for customers to switch to competing services in the event that they become dissatisfied with EVO's services. Compl. ¶¶ 20-21.  The real purpose of EVO's ETF, Spirit Locker claims, is to stifle competition in the electronic payment processing industry by preventing merchants from shopping around for the best service.  *Id.* ¶ 23.  The complaint asserts that the ETF provision has permitted EVO to collect revenues and generate enormous profits, not only by receiving the ETFs, but also by tethering customers to EVO for the duration of the original contract period and beyond.  *Id.* Spirit Locker alleges that EVO presents its standard Merchant Processing Agreement to prospective customers on a "take it or leave it" basis, *id.* ¶ 3, and contends that the ETF is

---

[3]      In October 2008, Spirit Locker brought suit against EVO in the Circuit Court of Jefferson County, Alabama.  *See* Declaration of Angelo Stio ("Stio Decl."), Ex. C.  In that action, Spirit Locker, along with its President, Gary Sumney, sued EVO for breach of contract, fraud, conversion, forgery, negligent hiring and agency liability.  The Alabama action did not mention the ETF, but claimed that EVO and its agents had represented that Spirit Locker could save substantial amounts of money by using EVO, and that EVO issued a "Price Match Guarantee," but that EVO actually charged Spirit Locker more than the agreed price.  Stio Decl., Ex. C, ¶¶ 8-9. After EVO moved to dismiss the Alabama action on the basis of improper venue, the court approved a Joint Stipulation of Dismissal without prejudice.  *Id.*, Ex. D.

deceptive because EVO describes it inaccurately as a liquidated damages clause, falsely dressing up an unlawful charge as an unquestionable fee. *Id.* ¶ 42.

The complaint purports to state a class action; the proposed class encompasses "all customers/subscribers to EVO's electronic payment processing applications, pursuant to contracts that include an early termination fee provision or who EVO has charged an ETF." Compl. ¶ 2. The complaint also proposes a sub-class of all subscribers to whom EVO charged an ETF (the "charged class"). *Id.* ¶ 29. Spirit Locker asserts that EVO is liable on three counts. In Count One, Spirit Locker claims that the agreement's ETF scheme violates New York General Business Law § 349, and demands damages on behalf of Spirit Locker and the charged class. Compl. ¶¶ 37-47. Count Two purports to state a claim for unjust enrichment, and seeks restitution of ETFs paid by Spirit Locker and by other members of the charged class. *Id.* ¶¶ 48-53. In Count Three, Spirit Locker seeks, on behalf of the entire class, a declaration that the ETF is an unenforceable penalty. *Id.* ¶¶ 54-61.

EVO now moves to dismiss Count One (the statutory consumer fraud claim) and Count Two (the unjust enrichment claim) under Federal Rule of Civil Procedure 12(b)(6). The motion does not challenge Count Three (the unlawful penalty / declaratory judgment claim).

DISCUSSION

A.    *Legal Standards on a Motion to Dismiss*

Motions to dismiss pursuant to Rule 12(b)(6) test the legal, not the factual, sufficiency of a complaint. *See, e.g., Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.' " (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)). Accordingly, I must accept the factual allegations in Spirit

Locker's complaint as true, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and draw all reasonable inferences in favor of the plaintiff. *See Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

In *Iqbal*, the Supreme Court offered district courts additional guidance regarding motions to dismiss under Rule 12(b)(6). Citing its earlier decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Court explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

129 S.Ct. at 1949 (internal citations and quotation marks omitted).

In deciding EVO's motion to dismiss, I may consider documents attached to the complaint as exhibits, or documents upon whose terms the complaint relies. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

B.     *The Challenged Counts*

1.     *The Statutory Consumer Fraud Claim (Count One)*

Section 349 of the New York General Business Law declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. N.Y. Gen. Bus. Law § 349(a). As originally enacted in 1970, the provision gave the New York Attorney General exclusive enforcement power. *See id.* § 349(b). In 1980, however, the New York legislature amended the

law to grant a private right of action to "any person who has been injured by reason of any violation" of § 349(a)'s prohibition on deceptive practices. *Id.* § 349(h).

A § 349 plaintiff is entitled to her actual damages, or to $50, whichever amount is greater. *Id.* Though proof of *scienter* is not necessary to establish a violation, *see Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank N.A.*, 85 N.Y.2d 20, 25 (1995), a court may increase a damages award where the defendant has willfully or knowingly violated the section. In those circumstances, the court may award up to three times the plaintiff's actual damages, so long as the total damages do not exceed $1000. N.Y. Gen. Bus. Law § 349(h). In addition, the court may award reasonable attorney's fees to a prevailing plaintiff. *Id.*

To make out a prima facie case under § 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result."[4] *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (citing *Oswego*, 85 N.Y.2d at 25). EVO challenges the sufficiency of the complaint's allegations with respect to each of the first two of these elements. As explained below, I find that the complaint fails to allege consumer-oriented conduct by EVO, and that Spirit Locker's claim therefore falls outside § 349's scope.

Nothing in the text of § 349 itself limits the provision to conduct directed at consumers. The provision, however, forms part of Article 22-A of the General Business Law, which is entitled "Consumer Protection from Deceptive Acts and Practices." Moreover, the original enforcement structure, in which only the Attorney General wielded the power to sue,

---

[4] Spirit Locker need not meet the heightened pleading standard for fraud actions under Federal Rule of Civil Procedure 9(b). Though § 349 is sometimes referred to as a consumer fraud provision, it does not require proof of the essential elements of common-law fraud, and is subject only to Rule 8(a)'s notice-pleading requirement. *Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).

"speaks to the [law's] public focus." *See Oswego*, 85 N.Y.2d at 25. Additionally, the Governor's Memorandum approving the original bill focused on its consumer-protective purpose, stating that "[c]onsumers have the right to an honest market place where trust prevails between buyer and seller," and noting that the law would be "an important new weapon in New York State's long standing efforts to protect people from consumer frauds." Mem. of Gov. Rockefeller, 1970 N.Y. Legis. Ann., at 472. From the provision's remedial structure and its legislative history, the New York courts have inferred that § 349 is limited to conduct directed at consumers. *See Oswego*, 85 N.Y.2d at 25; *see also S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996) (§ 349 "requires a finding of conduct that is 'consumer-oriented' ").

The paradigm § 349 case "involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods[,] usually by way of false and misleading advertising." *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (2d Dep't 1995) (internal quotation marks omitted). By providing for treble damages and one-way fee-shifting, § 349 seeks to level the playing field on which consumer plaintiffs litigate their disputes with fraudulent businesses. *Id.* But § 349 is not a "sword to be wielded in business-versus-business disputes ... where the party asserting the claim is not acting in a consumer role." Richard E. Givens, *Overall Scope of General Business Law §§ 349-350* (McKinney Supp. 1996) (quoted in *S.Q.K.F.C.*, 84 F.3d at 836).

With § 349's purpose in mind, courts have stated consistently that unique private transactions between sophisticated business parties do not give rise to liability under the statute. *See Oswego*, 85 N.Y.2d at 25 ("Private contract disputes, unique to the parties … would not fall within the ambit of the statute."); *Sutton Assocs. v. Lexis-Nexis*, 761 N.Y.S.2d 800, 802

(Sup. Ct. 2003) (dismissing a § 349 claim that alleged only "a private commercial dispute involving the two businesses involved in the transaction"); *Maurizio*, 230 F.3d at 521-22 (no § 349 liability in a copyright dispute between two alleged co-authors); *Genesco Ent'mnt v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) (excluding "single shot transaction[s]" from the scope of consumer protection provisions). In *New York University v. Continental Insurance Co.*, 87 N.Y.2d 308 (1995), for example, the New York Court of Appeals held that an insurance provider's decision to deny a university's claim fell outside § 349's purview. The case involved "complex insurance coverage and proof of loss in which each side was knowledgeable and received expert representation and advice." *Id.* at 290. Furthermore, the plaintiff did not meet the "consumer-oriented act" requirement because the disputed insurance policy "was not a standard policy," and "although it contained standard provisions … [it] was tailored to meet the purchaser's wishes and requirements." *Id.* Thus, the Court held, "this was not the 'modest' type of transaction the statute was primarily intended to reach. It is essentially a 'private' contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large." *Id.* at 291.

Nevertheless, a business may bring a § 349 claim if it is harmed by consumer-oriented conduct. The statute gives a private right of action to "any person who has been injured by reason of any violation" of the prohibition on consumer-oriented deceptive practices. *Id.* § 349(h). For example, in *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank N.A.*, 85 N.Y.2d 20 (1995), pension fund plaintiffs were permitted to proceed against a bank for material misrepresentations and omissions concerning the terms of savings accounts, even though the plaintiffs were not themselves consumers. The key to availability of the § 349 cause of action in *Oswego* was that the defendant had dealt with the plaintiffs' representative "as any

customer entering the bank to open a savings account, furnishing the [plaintiffs] with standard documents presented to customers upon the opening of accounts." *Id.* at 26. Since the account openings "were not unique to these two parties, nor were they private in nature or a single shot transaction," the "consumer-oriented act" prong of a § 349 claim was satisfied. *Id.* (internal citations and quotations omitted).

A plaintiff establishes consumer-oriented conduct by showing that "the acts or practices have a broader impact on consumers at large" in that they are "directed to consumers" *or* that they "potentially affect similarly situated consumers." *Oswego*, 85 N.Y.2d at 25, 27. Indeed, so long as the conduct is consumer-oriented, even a defendant's business competitor has standing to bring a claim under § 349, provided the competitor is incidentally harmed by the defendant's deceptive conduct. *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("The critical question [under § 349] is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor.").

Spirit Locker, which operates a liquor store, is concededly a business. In opposition to EVO's motion to dismiss Count One, it contends that EVO's conduct is consumer-oriented in that EVO markets credit card processing services to the public at large. The problem with this argument is that all of EVO's customers are, by definition, businesses. For Spirit Locker to succeed, it would have to establish that a business may *itself* be a consumer under § 349.

One New York case at the trial-court level provides support for the notion that small businesses may fall within the protected class.[5] In *Connolly v. WeCare Distributors, Inc.*,

---

[5]     In another decision, the Second Circuit appeared to leave open the possibility that the term "consumer" could include businesses, stating that "it is unclear whether franchisees qualify as consumers for the purpose of this statute." *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996). As

541 N.Y.S.2d 163 (Sup. Ct. 1989), the court allowed plaintiffs who purchased distributorships from a cosmetics company to bring a § 349 claim against the cosmetics company for deceptive recruiting practices. *Id.* at 165 ("Although plaintiffs may not necessarily be end-users of the product they are indeed end-users of the distributorships, which they bought and paid for."). In doing so, the court rejected the argument "that plaintiffs – as middlepersons in a marketing chain retailing defendant's products to the end-user consumers – cannot be deemed 'consumers.' " *Id.*

Subsequent appellate authority, however, excludes businesses from the definition of "consumer," stating unequivocally that a consumer is an individual who "purchases goods and services for personal, family or household use." *Sheth v. New York Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (1st Dep't 2000) (holding that the challenged practices were not consumer-oriented under § 349 because they were directed only at prospective insurance agents); *see also Cruz v. NYNEX Info. Res.*, 703 N.Y.S.2d 103, 107 (1st Dep't 2000) ("In New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for 'personal, family or household purposes.' ").

To support its argument that the conduct at issue is consumer-oriented, Spirit Locker points to certain features of its transaction with EVO. It notes that the ETF provision was contained in EVO's standard form, and that EVO presumably concluded a large number of similar contracts with other small businesses. In addition, Spirit Locker plausibly alleges a substantial inequality of bargaining power between the parties. In *Cruz v. NYNEX Information*

---

explained in the text, subsequent authority from the Supreme Court for the State of New York, Appellate Division (First Department) resolves the issue, unless and until the New York Court of Appeals chooses to depart from the intermediate appellate court's understanding of § 349. *See West v. AT&T*, 311 U.S. 223, 237 (1940) (the holding of "an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise").

*Resources*, however, the First Department rejected similar arguments and affirmed that a plaintiff bringing a claim under Article 22-A of the General Business law must allege conduct directed at non-business consumers:

> At first glance, the transactions in the matter at bar might appear to be within the ambit of General Business Law article 22-A, i.e., since they are modest in value, are repeated regularly with numerous parties, rely on a form contract, and involve parties with a large disparity in economic power and sophistication. But this analysis must take due account of the threshold question noted above – whether the conduct at issue is consumer-oriented.

703 N.Y.S.2d 103, 107 (1st Dep't 2000) (citations omitted).  The court found that a small business could not bring a claim against the publisher of a Yellow Pages directory under § 350 of the General Business Law, which also requires consumer-oriented conduct, where the defendant's allegedly misleading conduct was directed solely at businesses.  It reasoned that, "[s]ince advertisement space in the Yellow Pages is, by definition, a commodity available to businesses only, and plaintiffs fail to show how the complained-of conduct might either directly or potentially affect consumers, such conduct does not fall within the parameters of the statute." *Id*.

Similarly, EVO provides credit card processing services only to businesses. Though Spirit Locker alleges some of the features needed for a successful § 349 claim, it fails to meet the threshold requirement of consumer orientation, because EVO is alleged in the complaint only to have misled other business entities concerning the ETF.  *See also Citipostal, Inc. v. Unistar Leasing*, 724 N.Y.S.2d 555, 558 (4th Dep't 2001) ("The acts complained of are limited to business rather than consumer leases, and the conduct complained of cannot carry over to consumer transactions."); *Exxonmobil Inter-America, Inc. v. Advanced Info. Eng'g Servs.*, 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004) ("Contracts to provide commodities that are available only to businesses do not fall within the parameters of § 349.").

In short, though businesses may sometimes bring § 349 claims, they may do so only where the defendant's deceptive conduct is, at least to some extent, directed at non-business consumers.[6] Spirit Locker's complaint alleges conduct that is directed only at other businesses, and businesses cannot be consumers for this purpose. Accordingly, I conclude that the complaint fails to state a claim under § 349 of the New York General Business Law, and Count One is dismissed.[7]

      2.    *The Unjust Enrichment Claim (Count Two)*

EVO also moves to dismiss the unjust enrichment claim, under which Spirit Locker seeks restitution of the $395 that EVO debited from Spirit Locker's account under the ETF provision.

The purported basis for the unjust enrichment claim is that the ETF provision is invalid under the New York common law of unlawful penalties.[8] The law of contracts has long distinguished between liquidated damages clauses, which are enforceable, and penalty clauses, which are not. A liquidated damages provision is "an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977). If, however, the amount fixed "is plainly or grossly disproportionate to the probable

---

[6]    At oral argument, plaintiff's counsel directed my attention to the conclusion of my esteemed colleague, Judge Jack B. Weinstein, that "[s]mall business owners … qualify as 'consumers' within the meaning of [§ 349]." *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 338 F. Supp. 2d 422, 428 (E.D.N.Y. 2004). As explained in the text, I draw a different conclusion from the New York authorities, and respectfully disagree with Judge Weinstein's analysis.

[7]    In light of my ruling that the complaint does not allege consumer-oriented conduct, I need not pass on EVO's alternative contention that the ETF provisions are not materially misleading.

[8]    The parties agree that New York law applies to the unjust enrichment claim, and a choice of law clause in their agreement mandates the application of New York law. *See* Compl. Ex. A, § 16(B).

loss," the provision is a penalty clause and will not be enforced. *Id.* at 425. It is "not material" to the analysis whether the parties' agreement labels the provision one for "liquidated damages," as it does here, or whether, instead, the contract calls it a penalty. *Id.*

At this stage of the litigation, EVO does not seek to refute Spirit Locker's contention that the ETF is an unlawful penalty. EVO implicitly concedes that I cannot decide at the pleadings stage whether or not $395 was a genuine *ex ante* approximation of EVO's loss. EVO nevertheless contends that the unjust enrichment claim should be dismissed on the ground that even if the ETF provision is unlawful, there remains a valid and enforceable contract between the parties. *See* Compl., Ex. A, § 16(J) ("If any provision of this Agreement is illegal, the invalidity of that provision will not affect any of the remaining provisions and this Agreement will be construed as if the illegal provision is not contained in the Agreement.").

EVO's contention – that an unjust enrichment claim is never cognizable where a valid contract exists between the parties – is too broadly stated. To take an obvious counter-example, where one party to a contract accidentally pays another more than the contract requires, the overpayer has an unjust enrichment claim to recover the excess. *See, e.g., Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*, 790 N.Y.S.2d 84, 85 (1st Dep't 2005). That the parties remain bound by their contract in other respects does not bar a claim to recoup the mistaken overpayment.

The cases that EVO cites stand instead for two narrower principles. The first principle is that a party may not bring an unjust enrichment suit where it could instead bring a claim for breach of contract covering the same subject-matter. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389-90 (1987). This axiom applies most vividly to contracts for services. While the contract remains in effect, the performing party cannot recover

more than the contract price by bringing a *quantum meruit* action for unjust enrichment. Even if the defendant's gain exceeds the price plaintiff bargained for, the plaintiff is obviously precluded from adjusting the contract price by the mere expedient of recharacterizing his claim. *See id.* at 389 ("[I]t is impermissible … to seek damages in an action sounding in quasi[-] contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties."); *cf. Henry Loheac, P.C. v. Children's Corner Learning Ctr.*, 857 N.Y.S.2d 143, 144 (1st Dep't 2008) (plaintiff could recover under *quantum meruit* / unjust enrichment theory if it could show that it had performed work outside the scope of the original contract).

This rule – that a performing party may not bring an unjust enrichment action where he has a valid contractual claim providing agreed-upon compensation for the enrichment – has no application in this case. Spirit Locker seeks to recover the ETF. The agreement between the parties does not entitle Spirit Locker to recover the ETF; to the contrary, the contract imposed the allegedly unlawful penalty in the first place. Thus, the subject-matter of Spirit Locker's unjust enrichment suit is not covered by a valid, enforceable contractual obligation.

Another case that EVO cites as authority for the notion that the presence of a contract bars an unjust enrichment claim, *Moore v. Microsoft Corp.*, 741 N.Y.S.2d 91 (2d Dep't 2002), rests instead on a second narrower principle. In *Moore*, the Second Department held that the plaintiff's unjust enrichment cause of action was precluded by his own valid and enforceable waiver of liability. In that sense, the subject-matter of the claim was governed by the parties' contract. *Id.* at 92. The rule that a party may choose to forego an otherwise valid unjust enrichment claim is also irrelevant to Spirit Locker's claim to recover the ETF. EVO points to nothing in the written agreement whereby Spirit Locker agreed to waive any claim for unjust

enrichment. As noted above, it is irrelevant that the agreement itself characterizes the ETF provision as a liquidated damages clause rather than as a penalty. *See Truck Rent-A-Center*, 41 N.Y.2d at 425. In any event, assuming for the moment that the law recognizes a right to recover an unlawful penalty, it is far from clear that a contractual provision precluding such recovery would itself be enforceable.

EVO's objection to the unjust enrichment claim thus fails, but I am still required to determine whether Count Two of the complaint states a claim upon which relief may be granted. To prevail on a claim of unjust enrichment under New York law, the plaintiff must establish "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pacific Bancorp. v. FDIC*, 273 F.3d 509, 519 (2001). EVO was obviously enriched at Spirit Locker's expense. But New York case law does not appear to provide a clear answer the third question: is a defendant who receives payment under an unlawful penal damages clause required to return the money? The law might conceivably decline to lend its force to a penal sanction, yet choose to leave the enrichment where it falls if the breaching party has already paid. To determine whether this is so, it helpful to examine the policies underlying the courts' treatment of penalty clauses.

The chief drawback of penalty clauses is that, if they are enforceable, "[a] promisor would be compelled, out of fear of economic devastation, to continue performance." *Truck Rent-A-Center*, 41 N.Y.2d at 424. In economic terms, a penalty clause discourages efficient breaches by raising the cost of a breach to the contract-breaker. In this case, for example, Spirit Locker contends that the purpose of EVO's ETF is to stifle competition in the payment-processing industry by deterring merchants from switching to other processing

16

companies. Other potential difficulties with penalty clauses include that they give the non-breaching party an incentive to provoke a breach in order to make a profit, and that they discourage sensible modifications of existing agreements.

Despite these objections, economic analysts of contract law find it difficult to justify the courts' enduring refusal to enforce voluntarily-negotiated penalties for breach. There are several potential benefits to an agreed punitive measure of damages. A party who wants to convince others of her trustworthiness may choose to accept a penalty clause order to increase her credibility. Similarly, a penalty clause may compensate a seller for a high risk of default, enabling the seller to take greater risks and charge lower prices. In addition, a penalty clause may be the only means to provide true compensation to a promisee whose idiosyncratic wants would not be compensated by the standard expectation measure of contract damages. *See* Richard A. Posner, Economic Analysis of Law, 128-30 (7th edn. 2007); Charles J. Goetz & Robert E. Scott, *Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach*, 77 Colum. L. Rev. 554 (1977). Assuming rational choice by the parties, they will take the costs of a penalty clause into account and only include it if they expect the benefits to outweigh the costs. *See Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289 (7th Cir. 1985) (Posner, J.).

The approach of the New York courts to penalty clauses, however, bespeaks some skepticism about the tenets of Chicago-style economic analysis. The Court of Appeals has stated that permitting parties to utilize penalties as damages " 'would lead to the most terrible oppression in pecuniary dealings.' " *Truck-A-Rent*, 41 N.Y.2d at 424 (quoting *Hoag v. McGinnis*, 22 Wend. 163, 166 (N.Y. Sup. Ct. 1839)). On this view, parties very often sign on to penalties for breach without properly considering whether doing so actually serves their interests.

17

The justification for selecting penalty clauses for special treatment appears to be that contracting parties exposed to the penalty may systematically underestimate the risk that they will breach the contract. *See* Melvin Aron Eisenberg, *The Limits of Cognition and the Limits of Contract*, 47 Stan. L. Rev. 211, 227 (1995) (contract terms that fix remedies for breach attract greater judicial scrutiny because they "are systematically more likely to be the products of the limits of cognition than performance terms, that is, terms that specify the performance each party is to render"). Rather than incur the administrative costs of deciding whether each particular penalty clause is unconscionable, New York adopts a bright-line prophylactic rule, amounting to an irrebuttable presumption of unconscionability.

New York law is not entirely consistent in its treatment of punitive remedies for breach. Contracts for the sale of land constitute a major exception to the rule that the parties may not stipulate to supracompensatory remedies. Unlike some other jurisdictions, New York maintains the rule that the seller of real property may retain the full down payment in the event of the buyer's breach, regardless of whether that sum bears any relation to the seller's expected loss. *See Maxton Builders, Inc. v. Lo Galbo*, 68 N.Y.2d 373, 381-82 (1986); *Collar City P'ship I v. Redemption Church of Christ of the Apostolic Faith*, 651 N.Y.S.2d 729, 730 (3d Dep't 1997) (upholding forfeiture of a deposit approximating 50% of the purchase price). Perhaps because of the size of land transactions and the greater likelihood that the parties will take professional advice, New York law accords with the economic scholars' conclusions in this limited context. A breaching real estate buyer seeking to recover a deposit must actually establish unconscionability. *See Maxton Builders*, 68 N.Y.2d at 382 ("[R]eal estate contracts are probably the best examples of arm's length transactions. Except in cases where there is a real risk of overreaching, there should be no need for the courts to relieve the parties of the consequences of

18

their contract."); *see also Silverman v. Alcoa Plaza Assocs.*, 323 N.Y.S.2d 39, 41 (1st Dep't 1971) ("Perhaps it is the involved nature or uniqueness of real property that justifies such a rule.").

Outside the real estate context, down payments are treated differently. Under the Uniform Commercial Code, as adopted by New York, a buyer or lessee of goods subject to a punitive forfeiture clause has an action to get back a down payment to the extent it exceeds the seller's actual damages.[9] U.C.C. § 2-718(2), § 2A-504(2) (McKinney 2001). Similarly, at least one New York court has recognized the right of a breaching buyer under a contract for services to recover installment payments to the extent they exceed a reasonable amount of damages. *Rulle v. Ivari Int'l, Inc.*, 192 Misc.2d 266, 269 (App. Term 2d Dep't 2002) (seller of hair augmentation services would be required to make partial repayment of installments if they were grossly disproportionate to seller's loss). These down payment claims are different from Spirit Locker's in that they involve money paid before breach and withheld after breach, but they do provide support for a general rule of recovery of agreed monetary penalties that a court deems excessive. Similarly, a borrower who has paid interest under a usurious loan contract has the right to recover interest paid that exceeded the statutory maximum. N.Y. Gen. Oblig. Law § 5-513.

In light of the concerns underlying the rule that penalty clauses are unenforceable, I conclude that the New York Court of Appeals would recognize a right to recover money paid pursuant to an unlawful penalty clause. Given that the Court has stated that "[p]ublic policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory

---

[9]    The U.C.C. also recognizes small exceptions to the rule against penalties, allowing sellers and lessors to forfeit 20% or $500, whichever is smaller. U.C.C. § 2-718(2)(b), § 2A-504(3) (McKinney 2001).

authority," *Truck Rent-A-Center*, 41 N.Y.2d at 424, the Court would likely grant an unjust enrichment claim to deter the prospective "victim" of a breach from including a penalty clause in a contract in the first place. *See Rulle*, 192 Misc.2d at 269 (allowing retention of unlawful penalty "would violate public policy"). Moreover, the Court of Appeals has stated that enforcing a penalty clause would allow the non-breaching party to "reap a windfall well above the actual harm sustained," *Truck Rent-A-Center*, 41 N.Y.2d at 424, further supporting the conclusion that New York law would countenance a post-payment action to disgorge the "windfall."

There are countervailing reasons to let the enrichment lie where it falls. Allowing an unjust enrichment claim in these circumstances could lead to more lawsuits, an expense that might not be justified where the plaintiff chooses to pay the penalty then later regrets it. New York law, however, already accommodates that concern by means of the voluntary payment doctrine. That doctrine bars an unjust enrichment claim where, in the absence of fraud or mistake, the plaintiff made a decision to pay with full knowledge of the facts.[10] *See, e.g., Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 100 N.Y.2d 525, 526 (2003) (cable television customers could not recover late fees they alleged were unlawful penalties because they had paid them knowingly). The voluntary payment doctrine has no application to this case, because Spirit Locker's payment was not voluntary; the ETF was automatically debited from Spirit Locker's account.

Though, as explained above, the contract between the parties does not bar EVO's unjust enrichment claim, the contract remains relevant in that it may affect Spirit Locker's

---

[10] The voluntary payment doctrine resurrects in part the old common-law rule that a mistake of law cannot ground an unjust enrichment claim. Though the New York legislature appeared to abolish that rule in 1942, *see* CPLR § 3005, the Court of Appeals later held that the statutory reform permitted, but did not require, relief against mistakes of law. *Mercury Machine Importing Corp. v. City of New York*, 3 N.Y.2d 418, 427-30 (1957).

ultimate measure of recovery. Even if the ETF is an unlawful penalty, EVO might still have a claim for breach of contract against Spirit Locker for terminating the agreement early, in which case Spirit Locker would be obliged to pay for EVO's actual damages. *See JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d 373, 380 (2005) (where a purported liquidated damages clause is an unenforceable penalty, "the rest of the agreement stands, and the injured party is remitted to the conventional damage remedy for breach of that agreement") (quotation marks omitted). If EVO has such a claim, EVO is only *unjustly* enriched to the extent, if at all, the ETF exceeds EVO's actual damages.[11]

That question, however, is for another day. By plausibly alleging that its account was debited pursuant to an unlawful penalty clause, Spirit Locker has stated a claim for unjust enrichment. Accordingly, I deny the motion to dismiss Count Two.

## CONCLUSION

For the reasons stated above, the motion to dismiss Count One is granted, but the motion to dismiss Count Two is denied.

So ordered.


John Gleeson, U.S.D.J.

Dated:      March 19, 2010
            Brooklyn, New York

---

[11]     I express no view as to whether EVO's damages would operate to reduce EVO's liability on the unjust enrichment claim itself, or whether, instead, EVO's sole means of recovering any damages is to bring its own counterclaim for breach of contract.